**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MAGDY ABDELMASSIH,** | : | |
| *Plaintiff*, | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MITRA QSR KNE LLC et al.,** | : | **No. 16-4941** |
| *Defendants*. | : | |

## M E M O R A N D U M

PRATTER, J.                                                                      FEBRUARY 28, 2018

Magdy Abdelmassih worked for Kentucky Fried Chicken restaurants in Pennsylvania from 2001 until he was fired in 2014. He claims that his employer, Mitra, discriminated against him because of his age and medical conditions. Mr. Abdelmassih also seeks relief for violations of the FMLA, FLSA, PHRA, ERISA, COBRA, and unjust enrichment. The defendants seek partial summary judgment in their motion.

For the reasons set out in this memorandum, the Court grants summary judgment as to Mr. Abdelmassih's claim against Mitra for reasonable accommodations under the ADA. The Court also grants summary judgment on all of the individual claims against Messrs. Patel. The Court denies summary judgment as to Mr. Abdelmassih's remaining claims.

1

**BACKGROUND**[1]

### I.   The Mitra Defendants

In 2012, Mitra QSR KNE LLC, a Texas corporation owned by Manish Patel and Pushpak Patel, acquired 120 company-owned restaurants in Pennsylvania, New Jersey, Delaware, Virginia, West Virginia, and the District of Columbia.  Defendants Messrs. Patel are co-CEOs, own a combined majority interest, and have 100% voting rights in Mitra.  The purchase agreement required Mitra to hire each person already employed at the restaurants and honor each employee's length of service and anniversary date.

Nancy Jacobi worked in human resources in Mitra's Dallas office.  Although she eventually shared an assistant, she was the only HR professional for 3600 employees from 2012-2014.

Defendant Rakesh Ramdass was an Area Coach for Mitra and oversaw Mr. Abdelmassih and roughly 400 other employees in 6-8 restaurants.  As part of his job, Mr. Ramdass was responsible for "onboarding" new employees, which included providing them with Mitra's Handbook.  Mitra claims Mr. Abdelmassih acknowledged he received and read the handbook digitally; however, Mr. Abdelmassih says he never received the Mitra Handbook, which includes Mitra's policies on taking personal leave.   On several occasions, including one month before Mr. Abdelmassih was fired, Mr. Ramdass told Mr. Abdelmassih he looked "old" and that not wearing his dentures made him look older than he actually was.  Mr. Ramdass claims he and Mr. Abdelmassih had a friendly relationship and disputes that he made derogatory comments about

---

[1] On a motion for summary judgment, the Court must view the evidence presented in the light most favorable to the non-moving party, which, in this case, is Mr. Abdelmassih.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Mr. Abdelmassih's age.  Mr. Ramdass also called another employee "weak" for needing to take time off after a stroke.

## II.    Magdy Abdelmassih

Magdy Abdelmassih was born in Egypt in 1950 and immigrated to the United States in 1996.  He began working as a cook at a Kentucky Fried Chicken (KFC) restaurant in Lansdale, Pennsylvania in 2001.  He also worked in restaurants in Willow Grove, Montgomeryville, and Norristown.  Yum Brands!, which owns KFC, owned those restaurants at that time.  Mr. Abdelmassih rose through the ranks, earning promotions in 2003 and in 2006.  After Mitra purchased KFC restaurants in 2012, Mitra hired Mr. Abdelmassih.  Prior to his employment with Mitra, Mr. Abdelmassih was diagnosed with Chronic Obstructive Pulmonary Disease (COPD) and coronary artery disease (CAD).

## III.    FMLA Leave

In March 2014, Mr. Ramdass assigned Mr. Abdelmassih to work at the Willow Grove restaurant.  Mr. Abdelmassih preferred not to work at that location because the General Manager, Mariam Milad, was hostile towards him and would assign him non-managerial duties.  The assignment caused him such stress that he would use his inhaler before entering the restaurant.  On March 9, 2014, Mr. Abdelmassih experienced chest pains and had to leave work early to take his medication.  Although Mr. Abdelmassih informed Mr. Ramdass that he had COPD and CAD, Mr. Ramdass never discussed Mitra's leave policy with Mr. Abdelmassih.  Mr. Abdelmassih also told his General Manager, Joseph Abelard, about his conditions.

On March 11, Mr. Abdelmassih's son, Ramy Abdelmassih, contacted Mr. Ramdass about FMLA paperwork for his father.  During that call, Ramy recounts that Mr. Ramdass said his father had quit his job by leaving and was not handling his job well since Mitra took over.  Mr.

Ramdass sent the paperwork to Mr. Abdelmassih via email on March 13. Five days later, Ramy dropped off the paperwork with Ms. Milad and texted Mr. Ramdass that the completed paperwork was with her. Mr. Ramdass did not pick up the paperwork for a few weeks and, when he did, he left the paperwork in his car because he was "too busy" to submit it to Ms. Jacobi. Mr. Ramdass's lackadaisical approach meant that Mitra did not meet its obligation, under the FMLA, to designate FMLA leave within five days of receiving the completed forms. Ms. Jacobi did not see Mr. Abdelmassih's FMLA forms until her deposition on March 21, 2017 and Mitra's HR department was not aware Mr. Abdelmassih was on leave from March 9, 2014 until April 21, 2014.

There are two conflicting letters from Mr. Abdelmassih's doctor about when he could return from leave. The first, dated March 10, 2014, said he could return to work on April 7. The second, dated April 1, 2014, said he could return to work on May 8. Ultimately, he returned on April 21, two weeks earlier than the second letter recommended. The Mitra defendants never asked Mr. Abdelmassih to return to work before his doctor's recommendation, but Mr. Abdelmassih claims that he did not take the additional time because he was worried about losing his job and was not paid while he was on leave. Mr. Abdelmassih was also unaware that he could take additional time off under the FMLA or ask for reasonable accommodations under the ADA.

## IV. Mitra Terminates Mr. Abdelmassih

In 2013, Mr. Ramdass fired the General Manager of the Montgomeryville location because the location was having significant problems. In June of that year, Mr. Ramdass hired Mr. Abelard, who was just under 40 years old at the time. And, on March 23, while Mr.

Abdelmassih was on leave, the Montgomeryville restaurant failed an inspection from KFC Corporate.

When Mr. Abdelmassih returned from leave, he was assigned to work at the Montgomeryville location. Although Mr. Ramdass put other employees on a development plan designed to help those employees move up in the company, he did not offer this plan to Mr. Abdelmassih. Four months after Mr. Abdelmassih returned from leave, on August 16, Mr. Ramdass put him on a 30 day Action Plan because he determined that Mr. Abdelmassih was a cause of numerous customer complaints. Under the Action Plan, Mr. Ramdass was supposed to conduct weekly reviews of Mr. Abdelmassih's progress; however, Mr. Ramdass did not do so.

Emily Martin, a Region Training Leader, was responsible for performing "blind visits" to locations that were struggling. She conducted three blind visits to the Montgomeryville restaurant on August 9, August 23, and September 19, 2014. At these blind visits, Ms. Martin found Mr. Abdelmassih to be chaotic and ineffective. On the final visit, Ms. Martin witnessed Mr. Abdelmassih slam a tray of chicken on a counter while yelling indecipherably at a cook and saw him change time tags.[2] When Ms. Martin asked why Mr. Abdelmassih was changing the tags, he did not respond. He later claimed that the food was originally mislabeled and he was merely fixing the incorrect time tags. Ms. Martin discarded the product and went into the office where she again observed Mr. Abdelmassih changing time tags on the video surveillance system. Ms. Martin called Mr. Ramdass with her concerns. Mr. Ramdass informed Ms. Martin that Mr. Abdelmassih was on an improvement plan and these observations were "what he needed" to terminate Mr. Abdelmassih. That evening, Mr. Ramdass called Mr. Abelard and asked him to

---

[2] Time tags indicate how long product has been sitting out so employees know when it can no longer be served to customers.

meet at the Montgomeryville restaurant.  Without conducting any further investigation or contacting Ms. Jacobi, Mr. Ramdass fired Mr. Abdelmassih.

The Mitra defendants allege that Mr. Abdelmassih had a series of performance problems dating back several years that led to his termination.  These problems included that Mr. Ramdass counseled Mr. Abdelmassih on his failure to follow restaurant policies in 2013 and 2014 and Mr. Abelard had to instruct Mr. Abdelmassih on how to properly use time tags.  However, the only complaint against Mr. Abdelmassih in 2014 was that customers could not understand him when he did not wear his dentures.  Mr. Ramdass communicated this with Mr. Abdelmassih and Mr. Abdelmassih tried to wear his dentures despite the pain it caused.

Mr. Abdelmassih claims he regularly worked more than 50 hours/week and never received overtime pay or his last paycheck.  He also never received a COBRA notification about how to continue his healthcare benefits.

**PROCEDURAL HISTORY**

Mr. Abdelmassih brings claims against Mitra QSR KNE LLC, Rakesh Ramdass, Pushpak Patel, and Manish Patel (collectively "the Mitra defendants).  Originally, he also sued KFC/Yum!; however, those parties have settled and been dismissed from the case.

In his amended complaint, Mr. Abdelmassih brought eight claims.  Mr. Abdelmassih sued the corporation, Mitra, for discrimination under the Age Discrimination in Employment Act, discrimination and reasonable accommodations under the Americans with Disabilities Act, and associated claims under the Pennsylvania Human Relations Act.  He brought claims against all of the defendants for interference and retaliation under the Family and Medical Leave Act, unjust enrichment, and violations of the Fair Labor Standards Act, the Pennsylvania Wage Payment and Collection Law, ERISA, and COBRA.

The defendants moved for partial summary judgment on April 7, 2017 and the Court heard oral argument on January 29, 2018. All of the defendants seek to defeat Mr. Abdelmassih's claims under the ADEA, ADA, PHRA, and FMLA. Messrs. Patel also seek summary judgment on the individual claims against them under the FMLA, FLSA, WPCL, COBRA, as well as for unjust enrichment.

## LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson,* 477 U.S. at 248). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson,* 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the

initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## DISCUSSION

First, the Court will address Mr. Abdelmassih's claims against Mitra, the corporation, for age and disability discrimination, and his associated claims under the PHRA. Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts, such as the ADA and ADEA. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996). The parties have not argued that the PHRA claims should be analyzed differently in this case. Thus, Mr. Abdelmassih's PHRA claims will be subject to the same fate as his ADEA and ADA claims. The Court grants summary judgment on Mr. Abdelmassih's reasonable accommodations claim because he never requested an accommodation. The Court denies summary judgment on his age and employment discrimination claims because Mr. Ramdass made comments about Mr. Abdelmassih's age and disabilities and indicated he was looking for reasons to terminate Mr. Abdelmassih.

The Court will then consider Mr. Abdelmassih's claims against all of the defendants for interference and retaliation under the FMLA. The Court denies summary judgment on these claims because the Mitra defendants did not provide any of the required notices under the FMLA and Mr. Abdelmassih returned from his FMLA leave earlier than his doctor recommended.

When Mr. Abdelmassih returned from leave, the Mitra defendants treated him differently than before, placed him on an Action Plan, failed to include him on a development plan, and, ultimately, fired him. These actions, in addition to Mr. Ramdass's comments about finding a reason to fire Mr. Abdelmassih, are enough to make a claim for FMLA retaliation.

Finally, the Court will look at the claims against Messrs. Patel, as individuals, under the FMLA, FLSA, WPCL, and COBRA, as well the claim against them for unjust enrichment. The Court grants summary judgment on all of these claims because Messrs. Patel are too far attenuated from Mr. Abdelmassih's employment to be held liable.

## I.    ADEA Claim (Count I)

"The ADEA prohibits employers from 'discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643–44 (3d Cir. 2015) (quoting 29 U.S.C. §623(a)). Age discrimination claims based on circumstantial evidence are subject to the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting analysis. *Id.*

Under *McDonnell Douglas*, "the plaintiff must first establish a *prima facie* case of discrimination." *Id.* (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)). The prima facie case for discrimination under the ADEA requires the plaintiff to demonstrate that: (1) he is at least forty years old; (2) he suffered an adverse employment decision; (3) he was qualified for the position in question; and (4) he was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. *Willis*, 808 F.3d at 644.

After a plaintiff makes a prima facie showing, "the burden shifts to the employer to provide a legitimate non-retaliatory reason for its conduct." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017). If the employer succeeds on this point, then "the burden shifts back to the plaintiff 'to convince the factfinder both that the employer's proffered explanation was false . . . and that retaliation was the real reason for the adverse employment action.'" *Id.* (citing *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)). While the burden of *production* shifts under this analysis, the burden of *proof* always stays with the plaintiff. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

To discredit the defendant's proffered reason, the plaintiff cannot simply show that the defendant's decision was wrong or ill-conceived. The plaintiff must show that there is a genuine dispute as to whether *discrimination* motivated the defendant's actions. *Fuentes*, 32 F.3d at 765. In other words, the relevant inquiry is the perception of the decision maker, not the plaintiff's view of his or her own performance. *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) (citations omitted); *see also Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1993) (pretext turns on the qualifications and criteria identified by the employer, not the categories the plaintiff considers important). "[A]t the pretext stage it is not a court's role to rul[e] on the strength of cause for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Willis*, 808 F.3d at 647 (alterations in original) (internal quotations omitted).

Mitra assumes that Mr. Abdelmassih met his burden for the prima facie case of age discrimination. It highlights several legitimate, non-discriminatory reasons for firing Mr. Abdelmassih, including that Mr. Ramdass counseled Mr. Abdelmassih on his failure to follow restaurant policies in 2013 and 2014, Mr. Abelard had to direct Mr. Abdelmassih to properly use

time tags, Mr. Ramdass put Mr. Abdelmassih on a 30 day Action Plan, and Ms. Martin saw Mr. Abdelmassih change time tags and yell at coworkers. Mitra has demonstrated legitimate reasons for terminating Mr. Abdelmassih.

At this point, Mr. Abdelmassih must demonstrate that Mitra's proffered reasons for discrimination are pretextual. In order to demonstrate pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. The Court will focus on the second prong in its analysis of Mr. Abdelmassih's claim.

Although Mitra has legitimate, non-discriminatory reasons to terminate Mr. Abdelmassih, a reasonable jury could conclude that "an invidious discriminatory reason was more likely than not a motivating or determinative cause" for his termination. Mr. Ramdass disputes that he made comments about Mr. Abdelmassih's age; however, the Court must make all inferences in Mr. Abdelmassih's favor at the summary judgment stage. Mr. Abdelmassih claims Mr. Ramdass called him old and told him he looked older than he actually was when he did not wear his dentures. Furthermore, at her deposition, Ms. Martin testified that she called Mr. Ramdass after she witnessed Mr. Abdelmassih change time tags and yell at an employee. On that call, Mr. Ramdass said that she gave him "what he needed to terminate Magdy." Defs.' Mot. at Ex. F, 90:3-6. (Doc. No. 39-13). And, Mr. Ramdass stated at his own deposition that Mr. Abdelmassih likely had many more complaints against him but those listed in the Action Plan were the only ones he could "pin on him two years later or three years later." Defs.' Mot. at Ex. D, 60:11-18. (Doc. No. 39-8).

A reasonable jury could conclude that the Mitra defendants' proffered reasons were merely pretext for discrimination due to Mr. Abdelmassih's age. For these reasons, the Court will deny summary judgment as to Mr. Abdelmassih's ADEA discrimination claim.

## II.  ADA Claim (Count II)

Although not explicitly stated in his complaint, Mr. Abdelmassih makes two claims under the ADA related to his COPD and PAD: (1) reasonable accommodations and (2) discrimination. For the reasons outlined below, the Court grants summary judgment for Mr. Abdelmassih's reasonable accommodations claim because he never requested a reasonable accommodation. However, the Court denies summary judgment for his discrimination claim because a reasonable jury could conclude that Mitra discriminated against him because of his disabilities.

### A. *Reasonable Accommodations*

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999). For an employer "to be found liable for discrimination on the basis of failure to accommodate, the plaintiff must prove '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination . . . [which] in this context include[s] refusing to make reasonable accommodations for a plaintiff's disabilities.'" *Hohider v. United Parcel Service, Inc.,* 574 F.3d 169, 186–87 (3d Cir. 2009) (quoting *Williams v. Phila. Housing Auth. Police,* 380 F.3d 751, 761 (3d Cir. 1999)) (internal quotations omitted).

The EEOC's interpretive guidelines state that, "[o]nce a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. § 1630.9 at 359. This interactive process requires both parties to act in good faith and search for an appropriate reasonable accommodation. *Taylor,* 184 F.3d at 312 (citing *Mengine v. Runyon*, 114 F.3d 415, 419–20 (3d Cir. 1997)). While an employee, or someone on the employee's behalf, does not need to "formally invoke the magic words 'reasonable accommodation'" to request one, "the employer must know of both the disability and the employee's desire for accommodations for that disability." *Id.* at 313.

Mr. Abdelmassih submitted a request for FMLA leave on March 18, 2014. On that form, he indicated that he would be incapacitated due to his medical condition from March 10 until April 7, 2014. Pls.' Surreply, at Ex. A-2, p. 5 (Doc. No. 58). He also checked a box that indicated he would "need to attend follow-up treatment appointments or work part-time or on a reduced schedule" because of his medical conditions. Pls.' Surreply, at Ex. A-2, p. 5 (Doc. No. 58). When Mr. Abdelmassih returned to work on April 28, 2014, he never asked for a reasonable accommodation for his conditions, explicitly or otherwise. He argues that Mitra should have been aware that he needed some sort of accommodation based on his FMLA form alone. The Court disagrees.

Both parties agree that Mitra was aware of Mr. Abdelmassih's conditions. Although there was some difficulty in filing the FMLA papers, Mr. Abdelmassih was able to take roughly one month of FMLA leave for his conditions before returning to work. Mitra had a duty to

engage in an interactive process with Mr. Abdelmassih over appropriate accommodations for his conditions, if he asked for any accommodations beyond the FMLA leave he was granted. He did not. The FMLA form only clearly indicates that Mr. Abdelmassih needed to take a leave of absence from work and that he *might* need time when he returned to attend follow-up appointments or work part-time. When Mr. Abdelmassih returned to work, he never requested time to attend follow-up appointments or to be assigned part-time or on a reduced schedule. Nor does he point to anything in the record which indicates he asked for, or even hinted at needing, an accommodation when he returned. In fact, his only request was to be placed at the Montgomeryville location and he was placed at that location. There is no evidence anywhere in the record that Mitra failed to engage in an interactive process with Mr. Abdelmassih about reasonable accommodations. Mr. Abdelmassih should have been his own best advocate; Mitra should not be faulted for failing to read his mind.

For these reasons, the Court grants summary judgment for the defendants on Mr. Abdelmassih's claim for reasonable accommodations under the ADA.

### B. Discrimination

Similar to his age discrimination claim, Mr. Abdelmassih's disability discrimination claim is also subject to the *McDonnell Douglas* burden-shifting analysis. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). As such, the Court will first look at whether he meets the prima facie case for discrimination, then consider the Mitra defendants' legitimate, non-discriminatory reasons for terminating Mr. Abdelmassih, and, finally, examine whether the stated reasons were pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. 792.

"To establish a prima facie case of discrimination, a plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or

without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination." *Sulima v. Tobyanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010) (citing *Taylor*, 184 F.3d at 306). Mitra does not challenge whether Mr. Abdelmassih meets the prima facie case for disability discrimination. And, they rely on the same legitimate, non-discriminatory arguments for terminating Mr. Abdelmassih as discussed above in the Court's analysis of the claim for age discrimination. Namely, Mitra points to his repeated failures to follow restaurant policy, placement on a 30 day Action Plan, time tag violations, and yelling at coworkers. As stated above, these are legitimate, non-discriminatory reasons for termination.

Ultimately, Mr. Abdelmassih's disability discrimination claim falls along similar lines as his age discrimination claim. Although Mitra had legitimate, non-discriminatory reasons to terminate Mr. Abdelmassih, a reasonable jury could conclude that ADA discrimination "was more likely than not a motivating or determinative cause." Mr. Abdelmassih says that Mr. Ramdass called another employee weak because he had to take off time after a stroke, and that their good working relationship soured after he took FMLA leave. These facts combined with Mr. Ramdass's statement that Ms. Martin "gave him what he needed" to fire Mr. Abdelmassih and that he could only "pin" a few complaints on Mr. Abelmassih could lead a reasonable jury to conclude that Mitra terminated Mr. Abdelmassih because of his disabilities.

For these reasons, the Court denies summary judgment for Mr. Abdelmassih's ADA discrimination claim.

## III.    FMLA Interference and Retaliation Claims (Count III)

Mr. Abdelmassih brings two claims against the Mitra defendants under the FMLA: interference and retaliation. The Court denies summary judgment for both claims because a

reasonable jury could conclude that the Mitra defendants interfered with Mr. Abdelmassih's FMLA rights and retaliated against him for taking FMLA leave. In terms of interference, the Mitra defendants failed to provide Mr. Abdelmassih with required notices under the FMLA and the record indicates that Mr. Abdelmassih returned to work earlier than his doctor recommended. As for the retaliation claim, Mr. Ramdass treated Mr. Abdelmassih differently after he returned from FMLA leave than he did before, accused him of being the reason for customer complaints, placed him on an Action Plan, and, ultimately, fired him.

### A. Interference

The Mitra defendants deny that they interfered with Mr. Abdelmassih's FMLA rights because he was granted a one month leave for his health conditions and reinstated to his former position when he returned. While it is undisputed that Mr. Ramdass neglected to submit Mr. Abdelmassih's FMLA paperwork to HR, the Mitra defendants claim that his omission was a "technical violation" that had no real effect on whether Mr. Abdelmassih could take FMLA leave. The Court disagrees.

To make an FMLA interference claim, Mr. Abdelmassih must demonstrate: (1) he was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) he was entitled to FMLA leave; (4) he gave notice to the defendant of his intention to take FMLA leave; and (5) he was denied benefits to which he was entitled under the FMLA. *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (citing *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014)).

Mr. Abdelmassih says that he had no independent knowledge of FMLA leave and he only applied for it because his son, Ramy, was aware of it. His son then helped him through the application process and dropped the forms off for Mr. Ramdass to pick up and submit to HR.

Those forms never made it to HR because Mr. Ramdass left them in his car. Mr. Abdelmassih also says that the Mitra defendants never provided him with the required FMLA notices to inform him of his rights and duties under the FMLA while on leave. An employer can interfere with an employee's FMLA rights by "[rendering] him unable to exercise that right in a meaningful way." *Conoshenti v. Public Service Elec. & Gas Co.*, 364 F.3d 135, 143 (3d Cir. 2004). When an employee requests FMLA leave, the employer is supposed to provide the employee with notices about his eligibility, rights, and responsibilities under the FMLA. 29 C.F.R. 825.300(b)–(d). Mitra claims Mr. Abdelmassih was on notice of his FMLA rights because they were contained in the employee handbook, although he disputes that he ever saw the employee handbook. There is no dispute, however, that Mitra did not provide two other required FMLA notices to Mr. Abdelmassih.

Mr. Abdelmassih also says that the Mitra defendants interfered with his FMLA leave because he returned to work two weeks earlier than his doctor recommended. There is some dispute as to whether Mr. Abdelmassih actually returned to work before his FMLA leave should have ended. He provided two doctor's notes to the Mitra defendants. The first, dated March 10, 2014, said he could return to work on April 7. Defs.' Mot. at Ex. C3 (Doc. No. 39-5). The second, dated April 1, 2014, said he could return to work on May 8. Defs.' Mot. at Ex. C4 (Doc. No. 39-6). Mitra claims that they did not ask Mr. Abdelmassih to come back before May 8 but that he opted to do so on his own. Ultimately, Mr. Abdelmassih says he returned to work two weeks earlier than his doctor recommended because he was worried about whether the Mitra defendants would hold his job for him. The confusion around this issue is not for the Court to decide. A reasonable jury could conclude that the Mitra defendants interfered with Mr.

Abdelmassih's FMLA rights because they did not provide him with the required notices and he returned to work earlier than his doctor recommended.

For these reasons, the Court denies summary judgment as to Mr. Abdelmassih's FMLA interference claim.

## B. Retaliation

"Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012). As a result, FMLA retaliation claims based on circumstantial evidence are assessed under the *McDonnell Douglas* burden-shifting framework. *Capps*, 847 F.3d at 151–52; *see also Lichtenstein*, 691 F.3d at 301–02. As noted above, the *McDonnell Douglas* burden-shifting framework requires the plaintiff to first make the prima facie case of retaliation. Then the defendant must articulate legitimate, non-discriminatory reasons for any adverse employment actions. Finally, the plaintiff must prove that the articulated reasons were merely pretext for retaliation. *Capps*, 847 F.3d at 152 (citing *McDonnell Douglas*, 411 U.S. at 793).

To establish the prima facie case for retaliation under the FMLA, Mr. Abdelmassih must show that (1) he is protected under the FMLA; (2) he suffered an adverse employment action; and (3) a causal relationship exists between the decision to terminate him and the exercise of his FMLA rights. *Conoshenti*, 364 F.3d at 146. "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'" *Lichtenstein*, 691 F.3d at 307 (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

At oral argument, the Mitra defendants argued that Mr. Abdelmassih did not meet the prima facie case for FMLA retaliation because he did not demonstrate a causal relationship between his FMLA leave and the decision to terminate him. If he does meet the prima facie case, they argue there is no evidence of pretext.

Mr. Abdelmassih meets the prima facie case for FMLA retaliation. He says that everything changed after he came back from FMLA leave. He was placed at a struggling restaurant after it failed a corporate test and Mr. Ramdass decided that Mr. Abdelmassih was a cause of the customer complaints and placed him on a 30 day Action Plan. Mr. Abelard, the General Manager of that location, was not similarly disciplined.

Mr. Abdelmassih also points out that he was placed on the Action Plan four months after he took leave and was fired five months after he took leave. This timing, on its own, is not unduly suggestive of retaliation. "[T]he mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1303 (3d Cir. 1997); *see also Larochelle v. Wilmac*, 210 F. Supp. 3d 658, 704 (E.D. Pa. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) (finding two days between a plaintiff disclosing work restrictions related to a disability and firing was "an unduly suggestive temporal proximity"); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (finding that an employer placing the plaintiff on workers' compensation 19 months after the plaintiff filed an EEOC charge was not sufficient to demonstrate a causal link between the two events). However, when all of the evidence is considered together, including the fact that Mr. Abdelmassih was disciplined after he took FMLA leave, it demonstrates a causal relationship between his FMLA leave and termination for his prima facie case.

As noted above in the analysis of age and disability discrimination, the Mitra defendants demonstrated that they had legitimate, non-discriminatory reasons for terminating Mr. Abdelmassih. As such, the Court skips directly to the pretext analysis.

Mr. Abdelmassih points to several instances in which he believes he was retaliated against for taking FMLA leave including that the Mitra defendants excluded him from a development plan to move up within the company, placed him on a 30 day Action Plan, and terminated him. Mr. Abdelmassih argues that there is pretext for the same reasons as his disability and age discrimination claims. He also highlights the temporal proximity between his FMLA leave and the adverse employment actions he suffered. The Mitra defendants placed Mr. Abdelmassih on an Action Plan four months after he returned from leave and fired him one month later. Although neither of these time frames is unduly suggestive of retaliation on its own they can, and should, be considered in context: Mr. Abdelmassih was placed on the Action Plan and ultimately fired, in part, for customer complaints that started well before he was placed at the Montgomeryville restaurant full time. Furthermore, the record indicates that Mr. Abelard, the General Manager, was allowed to participate in the development plan and was not similarly reprimanded even though he was at the restaurant when it failed the inspection by KFC Corporate. Finally, the Court again points to the statements from the depositions of Ms. Martin and Mr. Ramdass in which Mr. Ramdass said he "had what he needed" to terminate Mr. Abdelmassih and that he pinned complaints on Mr. Abdelmassih.

Mr. Abdelmassih has presented enough for a reasonable jury to conclude that he was subjected to retaliation because he took FMLA leave. For these reasons, the Court denies summary judgment on his FMLA retaliation claim.

**IV.  Individual Liability of Manish Patel and Pushpak Patel for FMLA (Count III), FLSA (Count V), WPCL (Count VI), and COBRA (Count VIII) Claims**

Mr. Abdelmassih also seeks to hold Messrs. Patel, the co-owners and CEOs of Mitra, personally liable for violations of the FMLA, FLSA, WPCL, and COBRA.  Although individuals can be held liable in some capacity under each of these laws, Messrs. Patel cannot be held liable because they did not play an active, supervisory role in Mr. Abdelmassih's employment and were not the COBRA plan administrators.

*A.  Individual Liability under the FMLA, FLSA, and WPCL*

An individual can be subject to liability as an employer for violations of the FMLA, FLSA, and WPCL.  *Haybarger v. Lawrence County Adult Prob. & Parole*, 667 F.3d 408, 417–18 (3d Cir. 2012) (analyzing an individual's liability under the FMLA); *In re Enterprise Rent-A-Car Wage & Hour Emp't Prac. Litig.*, 683 F.3d 462, 467–68 (3d Cir. 2012) (citations omitted) ("[T]he FLSA defines employer 'expansively' and with 'striking breadth.'"); *Wieczorek v. Dempsey Partners, LLC*, 2013 WL 6578788, at *7 (E.D. Pa. Dec. 16, 2013) (citing *Tyler v. O'Neill*, 994 F. Supp. 603, 616 (E.D. Pa. 1998)) ("In order to establish individual liability against an agent or officer, the WPCL requires that the individual exercises a policy-making function in the company or takes an active role in the company's decision-making process.").  An individual is subject to liability when he or she exercises "supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation while acting in the employer's interest."  *Haybarger*, 667 F.3d at 417–18; *see also Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 153–54 (3d Cir. 2014) (analyzing the FLSA under the same framework as the FMLA); *Wieczorek*, 2013 WL 6578788, at *7 (E.D. Pa. Dec. 16, 2013) (finding an individual liable under the WPCL because she drafted employee and policy manuals, was in

charge of the plaintiff's group, was the plaintiff's supervisor, and was consulted on the decision to terminate the plaintiff).

"In analyzing an individual supervisor's control over the employee under the FLSA and the FMLA, most courts look to the 'economic reality' of the employment situation, examining whether the individual supervisor carried out the functions of an employer with respect to the employee." *Haybarger*, 667 F.3d at 417–18. Relevant factors include whether the individual "(1) had the power to hire and fire the employee[ ], (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* (quoting *Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).

Mr. Abdelmassih cites to an opinion from the Court of Appeals for the Second Circuit which held the owner, President, and CEO of a grocery store chain personally liable for FLSA violations even though he was not personally responsible for the violations and did not interact with the plaintiff directly. *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013). In that case, the individual employer was liable because his "actions and responsibilities — particularly as demonstrated by his active exercise of overall control over the company, his ultimate responsibility for the plaintiffs' wages, his supervision of managerial employees, and his actions in individual stores — [demonstrated] that he was an 'employer'." *Id.* However, that case is distinguishable from Mr. Abdelmassih's.

Messrs. Patel were the co-owners and CEOs of Mitra and the operating agreement said that they were in charge of the day-to-day operations of the company. Mr. Abdelmassih argues they abdicated their responsibilities to their employees by having one HR professional, Ms. Jacobi, assigned to 3600 employees. However, Messrs. Patel never interacted with Mr.

Abdelmassih, supervised his work, gave him a work assignment, determined his rate of pay, were aware of his medical leave, or made the decision to terminate him. Furthermore, there is no evidence indicating that they personally interfered with Mr. Abdelmassih's rights under the FMLA, FLSA, or WPCL. Messrs. Patel were at the top of the Mitra food chain and they had no direct interaction with Mr. Abdelmassih or his employment. Messrs. Patel did not exercise the kind of control over Mr. Abdelmassih's employment required for individual liability under the FMLA, FLSA, and WPCL.

### B. Individual Liability for COBRA Claim

"Pursuant to ERISA's enforcement scheme, only the plan administrator is liable for statutory penalties based on a COBRA notification violation." *Myrick v. Discover Bank*, 662 Fed. App'x 179, 182 (3d Cir. 2016) (citing 29 U.S.C. § 1132(c)(1) ("Any [COBRA plan] administrator . . . who fails to meet the [COBRA notice] requirements . . . may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal.")). The Mitra defendants provided a copy of the company's health insurance benefits brochure, which indicates that United Healthcare (UHC) is the insurance provider and states that employees should contact human resources to provide notice of qualifying life events under COBRA. Appendix in Support of Defs.' Mot. at Ex. E11 (Doc. No. 39-12). Ms. Jacobi is listed as the contact person for questions regarding COBRA. Appendix in Support of Defs.' Mot. at Ex. E11 (Doc. No. 39-12). Messrs. Patel, however, are not listed anywhere in the document. Mr. Abdelmassih has not pointed to any evidence that

Messrs. Patel were the plan administrators and they cannot be held personally liable for any failures by Mitra to notify Mr. Abdelmassih of his COBRA rights.[3]

**V.      Unjust Enrichment Claim against Manish Patel and Pushpak Patel (Count IX)**

Mr. Abdelmassih also seeks to hold Messrs. Patel individually liable under a common law theory for unjust enrichment because he regularly worked 10 hours of overtime per week, was not paid for that work, and was denied his last week of wages.  Unjust enrichment requires "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."  *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 180 (3d Cir. 2008).  Even assuming Mr. Abdelmassih was not paid for overtime or his last week of wages, there is nothing to indicate that Messrs. Patel personally benefitted from these actions.  Mr. Abdelmassih claims that, as the owners and CEOs, they must have benefitted from any unpaid wages.  However, Mr. Abdelmassih needs to draw a clearer connection between his unpaid wages and benefits Messrs. Patel, as individuals, appreciated than mere conjecture to make a claim for unjust enrichment.

---

[3] In their brief, the defendants also sought summary judgment on the COBRA claims; however, at oral argument held on January 29, 2018, counsel for the defendants notified the Court that Mitra, the corporation, was no longer seeking summary judgment on the COBRA claims.

**CONCLUSION**

For the reasons set out in this memorandum, the Court grants summary judgment as to Mr. Abdelmassih's claims for reasonable accommodations under the ADA against Mitra and all of the individual claims against Messrs. Patel.  The Court denies summary judgment as to Mr. Abdelmassih's remaining claims.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE